We'll hear argument first this morning in Case 2804, Houston Community College System v. Wilson. Mr. Morris. Mr. Chief Justice, and may it please the Court, the Fifth Circuit recognized a new cause of action based on an elected body censoring a member. That decision is wrong for two reasons. First, it ignores this country's history and parliamentary tradition, which recognize the right of elected bodies to govern their own affairs, including censoring members for violations of governance rules. And second, it makes the Free Speech Clause into both a cudgel and a shield. The Free Speech Clause undeniably protects a member's right to criticize the body upon which they sit. But it does not insulate the member from the elected body's speech and response. Wilson basically concedes the board's right to respond to its violations of its governance rules with its own speech when he argues the board could have passed a position statement calling his behavior inappropriate, indecorous, and regrettable, as long as it didn't use the words censure or punishment. But the Free Speech Clause doesn't dictate what words an elected body can use to reprimand one of its members, and elected bodies enforce rules with discipline, not position statements. Wilson focuses instead on three additional measures that were included in the resolution of censure, but this case involves only speech. The Fifth Circuit relied on censure alone in creating its new cause of action, and whatever might be true in other contexts, that holding is wrong in the context of this case. Allowing retaliation actions based on censures will destabilize legislative self-governance, forcing courts to referee local political disputes. Judges will be asked to draw unmanageable lines between a politician's speech and conduct or legislative and non-legislative speech, and boards like HCC's will have to shy away from enforcing their rules of governance because of the threat of litigation. This is not the right result. As Judge Ho said, the First Amendment protects freedom of speech, not freedom from speech. We ask this Court to hold that a member of an elected body may not sue for retaliation on a censure alone, and I welcome the Court's questions. Counsel, could a legislative body, is there any limit to its authority to expel or to sanction a member? Not under the Free Speech Clause, Your Honor. Is there any limit? There might be limits, for instance, if we were speaking about an Establishment Clause. Well, let's just say if there's an expulsion for basically the conduct that we have here. That would be within the realm of the legislative body to police its own member. What about imprisonment? I'm sorry, Your Honor? What about imprisonment? What can't you do? I'm just asking to see whether or not there are any limits to sanctioning. Well, I think that imprisonment, which might have been common in the common law tradition of England, is not within this nation's history. So are there limits at common law? As I understand your argument, you're saying that it's government speech and you can censure him. But now you say the limits are based in history or tradition. Why don't we just look to history or tradition to see the authority of the legislature in the first instance rather than create this new doctrine? I think you can do both those things and particularly agree that you could limit your opinion to finding that history and tradition support the tool of censure without expanding on this Court's government speech jurisprudence. Say that again? I think that this Court could reach a decision solely based on history and tradition, finding that censure is a tool of a legislative body, and based on that government interest, find in favor of HCC without speaking to the issue of government speech. Thank you. Well, a lot of the history and tradition that you talk about was before there was a First Amendment, right? That's correct. Well, I don't know how valuable that is then, particularly since with respect to some of the episodes, it was clear that the framers didn't like the result. There certainly were cases where the framers debated, particularly as it related to censuring of private citizens, whether that was not wise or not. But the parliamentary tradition of using censure as a tool to police members, merely a government expression of public rebuke, that predated the founding of the nation and continued through it today. If you look at almost any manual or parliamentary history in this nation, you're going to find the tool of censure included within it. I represent public school districts in Texas. There are some 1,100 of them. All of them govern themselves by Robert's Rules of Order, which also has the tool of censure within it. To deny the tool of censure to a government body, particularly in the era of the Internet, which was far different than this court faced when it recognized the remedy of free speech retaliation claim, is no small matter. These boards have very few tools to police their members, censure being one of the predominant ones and one that's been recognized for more than 200 years in this country. Justice Thomas' question begs a question here. I know that you say there should have been a cross petition on the other and sanctions imposed, but assume we disagree, just assuming, that we're looking at rendering someone ineligible for an officer position, ineligibility for travel reimbursement, and added approval required for the use of community funds. Those were the three additional sanctions imposed. How do we deal with those? You've got an easy case on censure, historically, but how do we approach those? I don't know that you've answered completely the essence of Justice Thomas' question, which assume others withholding pay, not just reimbursement, but suspending somebody's salary, fining them, jailing them, removing staff. We could do a whole list of things. What's the lens that we use to determine whether those are within some sort of non-actionable First Amendment retaliation and which are? I think this court should follow the Fifth Circuit's decision in that regard, as well as every other circuit that's considered the issue about other political punishments and found that elected officials don't have entitlements to those punishments, and so they're not sufficiently adverse to chill their speech. Well, you have entitlement to pay. You have entitlement not to be jailed. That might be true among some elected bodies. That's not true amongst HCC. Those are all volunteer positions. They don't have pay. But I think, more importantly, what I would suggest to this court, that when it created the remedy in Pickering, it presumed, because of the disparity of power in that employment race— Pickering is—I don't see how Pickering is relevant here. This is not an employee of the legislature, and this is not someone the legislature picked. This is someone the people picked. So I would agree— I agree, Justice Sotomayor, that Pickering is not in any way controlling. I would simply offer that while it might have been correct in Pickering to presume that there's a chilling effect in an employment situation where an employer exerts tremendous leverage in the relationship with an employee and might silence their citizen speech, that's not true in the political arena. And these political punishments did not silence Mr. Wilson. And Trustee Wilson made it very clear that no reprimand would silence him. And as this court said in New York Times v. Sullivan, elected officials are different than citizens. All right. You said jail is different or might be different. So write my opinion for me. Well, I— Assuming that we're dealing with those other—I'm not inviting you to write it for me in that sense, but hypothetically, how would you say, what are the things that legislatures can—what are the other things that are permissible to do? Well, I would say that the three political reprimands that were included in this case just do not rise to the level— Because there's no entitlement to them. There's no entitlement to them, and they would not otherwise have a chilling effect. When you say entitlement, I mean, they're part of the rules of the legislature that give you these things, so why aren't you entitled to them? Well, I think that the question really becomes, are the punishments—not every punishment gives rise to a free speech retaliation claim because not every punishment creates a chilling effect. And these are fairly modest punishments. Mr. Morris, I just wanted to clarify your answer to Justice Sotomayor. Are all of these—are the limits that might constrain a legislature's ability to punish, you know, with imprisonment maybe derived from other provisions of the Constitution? Like maybe there are obviously going to be due process limits. Maybe even there's no historical basis for thinking a legislative body has the ability to jail a member. I mean, you're framing all of this in terms of the First Amendment in your response, and I'm wondering if that's really what you mean. Well, I do mean that there can—I agree that there can be other limits, other textual limits in the Constitution and other procedural due process limits that might be afforded by state legislative bodies or local legislative bodies. And I have another clarifying question. Is it your position that the First Amendment is wholly inapplicable to the topic of legislative discipline, whether statements are uttered inside or outside of the legislative sphere? Or is it that the First Amendment applies, but that censure could never transgress its limits? The government's discipline of its members is simply not subject to First Amendment scrutiny, and this Court should not recognize the First Amendment retaliation claim in that context. Even in this Court's decision in Garcetti, the Court found that the government interest of providing services to the citizenry, coupled with concerns about separation and powers of federalism, led it to not recognize a free speech retaliation claim in that context. I would suggest to the Court that the government interest here, the body's ability to police its own members and enforce its own rules, which protects its integrity, protects public confidence, is a far more important interest than was at stake in Garcetti. Well, Mr. Morris, there is a kind of discipline which, of course, nobody would look askance at, which is to say that if a member acts inappropriately, you know, takes a bribe or misuses funds or something like that, then of course the legislature has it in its power to do something. But the theory here is that the legislature is acting only because the member has taken unpopular stance, has been critical of the legislature as a whole. And I guess just to clarify the clarification, are you saying that the First Amendment has nothing to say about that, no matter what the sanction is? Nothing to say about that when the sanction is either a mere censure, a government statement of its own viewpoint condemning the actions of the member. No, but that's what the question is. And this is the same question that Justice Thomas started out with. Where is the line between, well, of course, you can censure somebody, versus, well, no, you can't put somebody in jail for stating an unpopular opinion. I think it's very difficult to prejudge the issue of a body that might incarcerate an individual. I don't know that that's within the history and tradition of this country. There are punishments, though, I would think, that might rise to the level of an expulsion that might pose the outer limit. But even this Court recognized in Powell v. McCormick that the issues of expulsion were very different than the issues of exclusion. And maybe Bond v. Floyd sets the only outer limit, which was really about the refusal to seat a member. But once seated, the important government interest here is, different than in Bond, is that the body has a need to be able to use the tool of censure. Mr. Moore, do we have to get into any of this in this case? I thought the issue, all we had to decide was a mere censure does not trigger a retaliation claim. And I think it will be difficult, potentially, to draw lines beyond that for the reasons the questions have raised. Is that accurate, that all we need to resolve is the mere censure? Justice Kavanaugh, that is absolutely correct, based on this Court's jurisprudence. And because the Court found in favor of HCC on these other measures, HCC only petitioned the Court relative to the censure itself. And so Wilson's argument that this Court should consider the other measures would expand the judgment. And that's something this Court has said you can't do without filing a cross-petition. Having said that, I will ask a hypothetical, which is suppose the censure had a resolution with it, as they do and did, and the censure resolution includes something that is false and defamatory about the censured individual. Can you distinguish the censure itself from the statement in the censure resolution? And can the person bring a claim about the resolution, the speech in the resolution? Depending on the state, there may be state law remedies for defamation, but it wouldn't be something that the First Amendment speaks to. This Court said in Paul v. Davis that sometimes there are injuries that the Constitution does not remedy. Defamation being one of them. But here, Mr. Wilson has never contested that he did not violate the rules, and he's never contested that anything in the resolution is untruthful. He simply says that the government as a whole, the majority of the body, could not respond to his speech with its own condemning speech. And we think this Court's precedent says that that's not true as a matter of history, or this Court's government speech jurisprudence. Suppose there are two factions contesting positions on a school board, and one faction narrowly wins, and when they get the majority, they say, all of the things that were said by the other faction during the campaign were utterly despicable, and therefore we are expelling them all from the body. Would the First Amendment permit that? The First Amendment may not allow the expulsion if that reaches the outer limits of bond, but certainly the statement of condemnation that we're asking for, yes, it would certainly allow that. All right, it would allow a statement of condemnation. It might not allow expulsion. Could they take away all of the normal privileges of office from the other faction? So if members were allowed to use a special room, kick them out of the room, etc., etc.? Yes, they could, because they police their own rules, and sometimes they exact political punishments. That's just part of the hurly-burly of politics, and if they overstep, then presumably the voters in that jurisdiction may take them to task for it. I see that I'm out of time. Thank you, Counsel. Just one area I'd like to touch on briefly. You know, there are collective governmental bodies, and there are collective governmental bodies. I mean, let's say something like the Board of Patent Appeals censures one of its three members because they saw at a baseball game that he didn't stand for the national anthem. Do you analyze that the same way as this case? It's certainly not at the core of this case where the resolution dealt with the performance of a member's duties, but I do think that the First Amendment will probably still allow that speech. When an elected body, in particular the representatives that decide to make a statement, no matter how far afield we might think it is, it is a matter of public concern if the representative body and a majority of the members decide it to be so. Well, is something like the Board of Patent Appeals a representative body? I mean, I'm not recalling exactly what it's like, but I assume it's appointed by some other – vaguely recall that it's appointed by some other governmental officials, and its job is in no way related to policing who's standing or sitting down. Well, ACC's position is we're arguing for a rule that would govern elected bodies, and perhaps the Solicitor General has a different view about other bodies, but I would say this, Your Honor. Regardless of whether the body is elected or appointed, there are still political considerations, and as the Fourth Circuit recognized in Widener, even the humblest assembly of men needs rules to govern because you have shared decision-making on positions of policy. Thank you, Counsel. Justice Thomas? Just one question, tangential question, Mr. Morris. Would a legislative body have the authority, under your argument, to censure a private citizen who somehow is at odds with their rules within their chambers? They very well may have the authority to do that, yes. It's a different government interest than what we're asking for here, but yes, under the First Amendment, they could express their own viewpoint-based condemnation of a citizen's conduct. And how far does that expression go? And I think that's part of the question because I think the way that Respondent looks at it is even the censure is going to go as far as a deprivation of certain privileges. So in your thinking, how far could you go with respect to a private citizen in comparison to a member of the body? I think that this Court has never weighed the speech once it enters the marketplace of ideas, even for the government. And Justice Scalia, in Means v. Block, a circuit court opinion, I think aptly said that even citizens have to be able to endure the criticisms of government. So I would not offer a rule that says merely because the government speaks in condemnation of a citizen that that would run afoul of the First Amendment. The redress for that, again, would be left to the electorate, the voters. Is there a historical basis for that? When we began our argument, when you began your argument, I asked you about the historical basis for sanctioning a member of the body. Is there a historical basis for sanctioning a private citizen? There's not much that we could find, Justice Thomas. I mean, there certainly was discussion in connection with the Whiskey Rebellion where there was great debate between Washington, who introduced the resolution of censure, and Madison. And Madison wasn't particularly fond of that. He was not. But no rule emanated from that great debate, certainly no rule that said that the First Amendment would have precluded the ability of bodies to censure even private citizens. I imagine it would be a fairly extraordinary circumstance. And again, if the governmental body overstepped, they'd probably pay the price at the ballot box. Thank you. Justice Breyer? Justice Alito? Justice Sotomayor? Justice Gorsuch? No questions, thank you. Justice Barrett? Thank you, Counsel. Mr. Joshi?  The censure resolution adopted by an elected body against one of its members does not abridge that member's freedom of speech. Elected bodies in our Anglo-American legal tradition have long entered disciplinary actions against their members, including for those members' speech, with no suggestion that it violated principles of free speech. More to the point, Congress, since 1791, has censured and even expelled its members for their private speech. The 1797 expulsion of Senator Blunt, the 1844 censure of Senator Tappan, and even a 2019 House resolution condemning the private speech of one of its members. In none of those instances was there any suggestion that those disciplinary actions abridged the member's freedom of speech within the meaning of the First Amendment. Now, as this Court has held in a variety of contexts, including the First Amendment, that kind of constitutional history is essentially dispositive and easily resolves the question presented in this case. Alternatively, you could view the censure here as a form of governmental speech, which under this Court's cases, therefore, doesn't violate anyone else's free speech rights. But either way, this Court should reverse the judgment of the Court of Appeals. Which of the two approaches is your preference? I think we would probably prefer the first one because it's narrower. This case is really over-determined. I think in the briefs I found, you know, at least five different ways in which to reverse the Fifth Circuit. And as many members of this Court have said, easy cases sometimes make bad law. And so we would recommend taking the historical approach because it is the most cabined and it is the one least likely to generate unintended consequences in other areas of law, some of which we set forth at the back of our brief. Mr. Joshi, is it clear to you that a history that's all about members of Congress applies equally to members of a local school board, part-time, unpaid? You know, there are elected representatives and then there are elected representatives. Should we try to draw any distinctions? I'm not sure that's worthwhile and for a couple of reasons. First, I think in answer to a question that had been raised earlier, I think, by the Chief Justice, the reason that the common law history predating the First Amendment matters is because just as in Tenney with legislative immunity, I think the idea is that the Constitution's grant of the disciplinary power and the expulsion power reflects a well-understood, universal, long-established tradition of legislative bodies. And then the idea there between, you know, by analogy to cases like Tenney and Bogan against Scott Harris, because it's such a well-developed and well-understood power of these elected bodies, even in states or in localities where it hasn't expressly been codified in the Constitution, we should presume that unless some provision of positive law removes the power, that it exists by virtue of there being an elected body. And so I think just by analogy to legislative immunity, Tenney and Bogan, I would say the same thing should apply here. Is it even necessary for us to take that approach? Because if we say that the First Amendment allows certain actions that have been historically taken by Congress against members of Congress, we're going down the path of drawing a line, perhaps, regarding the issue of which sorts of actions can be taken in retaliation for speech. But unless there's something special about the word censure, and maybe there is, this is a very easy case. One person says something derogatory about another person, and then the other person responds by saying something derogatory about the first person. That's not a violation. Nobody's free speech rights are violated there. So why not decide the case on that simple basis? Why get into the whole question of what a legislative body can do, what sanctions can be taken against one of its members if it's not happy with what the member said? I think that would be a fine ground on which to decide this case. I suppose we were just taking the case as it came to the Court and as the Fifth Circuit decided it. And our proposition is that if you were to look at it as a censure resolution adopted by an elected body, what the history tells us is, first, that is within the traditional power of an elected body, and then, second, that that exercise, even if taken in response to a member's speech, does not abridge that member's freedom of speech. And so it's the combination of the power and the particular right that's being alleged to have been violated, and we're saying the history is really clear on that combination. And if that's all you say, that would not only resolve the case, but it would do so, I think, in the narrowest possible way. How clear is our own rule that we can't look at these other things that happened to him? It's true he didn't cross petition, but you also can affirm on a ground that's in the case that's reasonably related. I think we've done that quite a lot. I'm curious because suppose that Mr. Wilson bought a ticket to El Paso where he's going to speak to a group of high school students and he buys some catalogs from the community college and he wants to pass them out and criticize everybody in sight. The ticket cost him $500. It was a very expensive plane. And he spent $1,000 on all these catalogs, and now he asks for reimbursement. And everybody else is reimbursed, but the board says, read the resolutions. We're not going to pay you. You're out $1,500. Now, that seems more of a question. Can we not get into that? And why not? And what's the answer to it? All right. So let me take those in order. I think the first question is, can you get into it, as in, is this jurisdictional? No, it's not. This is clearly a matter of the Court's prudence. The second question is, well, could you just – is this an example of simply affirming on another ground? I'm not quite sure it is, and here's why. First of all, you wouldn't be – you would be reversing that portion of the Fifth Circuit's judgment that expressly said that those did not form – that he hadn't stated a claim for those. But second, I think – and again, this is not a jurisdictional issue, but for example, if you were to just affirm the judgment or if you had denied cert in the first instance, I'm not sure the Fifth Circuit's mandate would have permitted him on remand to seek discovery and then seek a theory of damages related to those other actions. He could only, I think, seek damages for the censure itself, at least according to the Fifth Circuit's judgment. So I do think it wouldn't just be an affirmance of the judgment. It would be an expansion of it, which would ordinarily require a cross-petition. But setting all of that aside, I think your question was, you know, on the merits, what if they denied him funding? That is admittedly a much more difficult case. But I think what you would do in that scenario, if you adopt our first historical argument, is you would ask the same question. Is this the kind of disciplinary power that has been exercised by elected bodies? And then would the exercise of that power in response to a member's speech abridge that member's freedom of speech? And on this front, I guess I can offer just analogies, right? So, for example, we know that it's a long traditional power for an elected body to strip members of committee assignments and committee chairpersonships and other plumb positions that also come sometimes with perks of the job. And those have never been thought to be abridging anyone's freedom of speech. In fact, those sorts of things are often done purely on a viewpoint basis. So where is the line that you would draw, Mr. Joshi? What are the impermissible responses to speech? It's hard to come up with an infinite catalog of them. I will offer, you know, one, for example, this court in Kilbourne against Thompson specifically addressed imprisonment and made clear that although Parliament could exercise that power, in America, we split apart. One of the reasons Parliament could do that was because it also sat as a court of review. Here in America, we separated out the judicial, the executive, and the legislative functions. And so that power to imprison, to the extent it remained in Congress. How about docking the salary of a representative? So fines have certainly been a traditional form of punishment. Indeed, in the most recent House censure in 2020, they fined the member $50,000. My understanding, I read in the paper this morning, that the House has fined another member for violation of rules and those fines have accrued. So to the extent you think docking salary is analogous to fines, that would be a permissible punishment. That said, candidly, we have not found a history of Congress, especially in the framing area, having imposed a fine as discipline in response to a member's speech. So I can't tell you that there is a historical justification, in the same way I am for this censure, that a fine would be permissible, but that's the kind of argument that I think would be made. How about taking away a member's staff and really all the things, all the ability to serve in the job, whether it's committee assignments or floor privileges or, you know, Again, those could present difficult and maybe fact-sensitive questions, but I think at least from the historical side, you would search for analogies to those kinds of actions. My guess, as I said, is that committee assignments and chairpersonships and any associated perks, you know, bigger office, maybe a slightly bigger staff, those would probably be fine and I think we could probably find a historical justification for it. I mean, does this strike you as a fruitful endeavor, is to try to figure out what they did several hundred years ago with respect to these very specific kind of punishments? I mean, maybe we'll find them and maybe we won't and maybe we'll just pick out our friends in a crowd. That could well be right, but I guess my point here is that, and I'll just come back to it, this is a really easy case and so on this easy case, because there is this very obvious historical tradition of censoring and expelling members, including in response to their speech on a viewpoint basis, with no suggestion that it abridged the member's freedom of speech. That is a really easy way to decide this case and that's the kind of mode of analysis this court employed, for example, in Minnesota Republican Party against White, Nevada Ethics Commission against Carrigan and even the concurring opinion in that case. And because that history is so obvious, that is the sort of narrowest ground on which to resolve this case and we think the safest ground, simply because it will just avoid any broad statements here that might be obvious in the easy context of this case that could be lifted out of context and inadvertently have some spillover effects. Do you think that legislative bodies are different from other multi-member government bodies with respect to all of this? For example, multi-member administrative agencies or multi-member appellate tribunals? So as far as history goes, yes, because we do have a historical tradition of elected legislative bodies exercising discipline over their members. I can't really say the same about multi-member appointed bodies like the patent board or like a multi-member court. So, given that our argument there doesn't work, some of the other arguments in the book... Is there some conceptual reason to draw a distinction? I suppose I would turn to the distinction this court drew in Minnesota Republican Party against White in which it said because there wasn't a history of elected judges and because the early elected judges shortly after the founding really were sort of politicians and they would run judicial campaigns, that that lack of history suggested that a rule preventing the judge from speaking on important matters of public interest might violate the First Amendment. And so I think that would be the sort of analysis you would say is that if there isn't a history to back it up, then I think you have to resort to sort of more traditional First Amendment analysis. In a case like this, I suppose it might be would a similarly situated person or judge of ordinary firmness have been chilled, but that's exactly the kind of analysis I think you don't need to get to here because as this court has said in a variety of contexts, when the history is clear and the history is clear that this sort of exercise of discipline does not abridge the member's freedom of speech, that essentially resolves the question presented. But Mr. Joshi, to go to Justice Kagan's point, if we decide the case that way, then doesn't that suggest that the analysis for all the different kinds of disciplinary measures or sanctions that Justice Kagan and others have identified, that that would be the right analysis to apply, thereby getting into this question of, well, what was the history with respect to docking pay or stripping people of plum assignments, et cetera? If a case were to present itself, yes, that's what you would have to analyze. So it could have broader spillover effects. The analysis would apply, but I think this court has applied exactly that analysis in a variety of situations, including the First Amendment as in Nevada Ethics Commission, Minnesota Republican Party, Noel Canning. I could go on. So the analysis is all you would apply here. You would apply it to the censure, and that would resolve this case. It wouldn't necessarily answer the question about fines or imprisonment or any other form of discipline, but you don't need to in this case, and we would urge you not to, precisely because we want to avoid those kinds of spillover effects, and those should await a case in which they're presented. Thank you. Thank you, counsel. Justice Thomas, anything further? Just one question. The resolution of censure, which we all agree that's the subject, right? Yes. It includes be it further resolved that the respondent is hereby publicly censured for his conduct. You say we can resolve it on that. But the next paragraph in that censure resolution is be it further resolved that the respondent is ineligible and goes on to impose the other sanctions. On what basis do we disaggregate the resolution? I think first, as I answered Justice Breyer earlier, because that was the ground on which the Fifth Circuit decided the case, and that's the question before you here. In terms of, like, why would we disaggregate? The confusion is we have one document that is the resolution of censure, but you're saying that we only dispose of it on the first paragraph, on the basis of the first paragraph I read. Yes, because I think the constitutional analysis should turn on substance, not on form, or, as this Court has said, the Constitution considers substance, not shadows. So you have to look at each form of punishment, and you might consider them together if you think together they're sort of chilling as a whole, but in this particular case, the substance of the censure resolution on which the Fifth Circuit reached its decision was just the pure censure. The other elements are not before you, but I think would require separate analysis, as I discussed with Justice Breyer and Justice Barrett earlier. Well, I think the confusion is that the resolution doesn't make that clean distinction. It's one — all part of the censure resolution. That's true, but I think, you know, if — I don't think the analysis would necessarily or ought to turn on if the body imposed four forms of discipline in four resolutions or imposed all four of them in one resolution in four paragraphs. That shouldn't change the constitutional analysis. I think you still need to look at each form of substantive punishment and ask, is this the kind of punishment that was thought to have abridged a member's freedom of speech if done in response to the member's speech? And if the answer is no, then no, and then you move on to the next one, and you go down the line. And it doesn't matter if they're contained in one document or four documents. Justice Breyer? Justice Sotomayor, anything further? Okay. Justice Gorsuch, anything further? No, thank you. Justice Kavanaugh and Justice Barrett. Thank you, counsel. Mr. Kimberly? Thank you, Mr. Chief Justice, and may it please the Court. The question here boils down to whether the resolution of censure adopted by HCC's Board of Trustees was merely an expression of government opinion concerning the content of Mr. Wilson's speech or instead a punishment for it. We submit that it was punishment for three principal reasons. First, the resolution imposed concrete penalties. These were baked into the censure itself both by its express terms of Petition Appendix 44A and also by operation of the Board's bylaws at JA 66. As a consequence, Mr. Wilson was, among other things, denied travel reimbursements and access to $5,000 in community affairs funds for a period of one year. Second, the censure concluded with an express command that Mr. Wilson must immediately cease and desist from further criticisms of the Board upon threat of further punishment that would have extended the period during which his privileges of office were denied to him. And finally, the censure imposed these penalties pursuant to the Board's official disciplinary authority. The resolution thus recited several rules codified in the Board's Code of Conduct. It made formal findings that these rules had been violated by Mr. Wilson's speech, and it concluded that he was therefore worthy not just of a verbal response but of formal discipline, of sanction, and that is precisely what it delivered. Against this background, Your Honors, our submission is that HCC is simply wrong to say that this resolution was merely an expression of opinion. An elected body's formal exercise of its disciplinary authority to enforce a Code of Conduct, its official invocation of its disciplinary authority to find rule violations, and its self-described imposition of sanctions for those rule violations is punishment and regulation. It is not expression of opinion. Simply put, the censure resolution here was a serious penalty intended to chill and deter, and because it was adopted in response to conceitedly protected speech, it violated the First Amendment. I'm happy to take the Court's questions or otherwise move on to the balance of my argument. Petitioner seems to suggest that or argue that if the courts get involved in this, that we would be involved in the rough and tumble of politics and that it would not be productive. What would be your response to that?  The first is that our theory here and what we're asking this Court to hold is limited to formal disciplinary measures in response to speech. Now, what is that? What is formal disciplinary? So formal disciplinary, I think it has three elements. The first is there is an identification of certain rules of conduct. There is then a disciplinary process by which it is determined that those codified rules of conduct have been violated, and there is in turn the imposition of sanctions for those violations. This is a distinction that is familiar to elective bodies at the local level throughout the country. They know the difference between disciplinary proceedings on the one hand and merely adopting a position statement on the other hand. Our theory is limited exclusively to this invocation of disciplinary proceedings and sanctions for rule violations. And I should say that the direct answer to Your Honor's question is that sort of response to speech is extraordinarily unusual. My friends on the other side can point to 11 examples in all of American history in which an elective body has censured somebody or imposed any kind of discipline for speech taking place outside of the legislative sphere. And so there's no reason, Your Honor, to think that this is going to pull courts into local politics, because really all we're talking about is the machinery of discipline, which is distinct from mere exchanges of ideas in the marketplace of ideas. So just to make sure I understand your answer there, in other words, obviously you take this situation where there's a formal resolution. What if that on the floor of the, however the community college board meets, somebody said we should make clear that we find Mr. Wilson's conduct reprehensible and think he's not acting according to the way that a board member should act and blah, blah, blah. All in favor say aye, and there's aye. Any opposed? One or two people. Would that bring you to the same position? Or just because of the formality of the statement, the result is different? Well, the short answer, Your Honor, I think is no, the hypothetical that you're describing would not represent a First Amendment violation. I think it's critical to recognize that this is not just a formality. Bylaws of local elected bodies throughout the country recognize an important distinction between disciplinary proceedings and other proceedings, and they provide trial-like protections before censures may be imposed. Robert's Rules of Order, which my friend on the other side has observed, is incorporated into a great many such bylaws, recognizes the same, that when a censure is proposed on the basis of conduct taking place outside of the lawmaking body itself, that formal charges must be made, that notice must be given, a trial must be held, there's a right to cross-examine witnesses, there's a right to representation by counsel. All of these very serious procedural measures intended to protect the rights of individuals accused of violating a code of conduct are reflective of an understanding that an official censure is, in fact, a very serious issue. So what you're saying is that they could do, putting aside the second paragraph, everything in the first paragraph so long as they didn't do it under a formal procedure. Anybody who wants to censure will say, you know, vote aye and all that. In other words, it's the formality that makes a difference? It's not the formality, Your Honor. It's the fact that this resolution recited three rules of conduct and made findings officially on behalf of the elective body itself, the governmental body, that Mr. Wilson's speech transgressed these codified rules. If the resolution in Your Honor's hypothetical does the same, I don't think what's important for our purposes is whether or not the steps are actually followed. I think the question is, in form and substance, is the resolution a disciplinary resolution? Does it rely on a codified rule? Does it hold that speech protected by the First Amendment violates that rule, and does it in turn impose a sanction in consequence? That is, I think, exactly what the Court had in mind in Laird v. Tatum when it said that what the First Amendment is concerned about is regulatory governmental actions. And that's precisely what we have here. We have the invocation of a rule of conduct and a formal determination that speech protected by the First Amendment violates that rule. We also have broad contextual indications that this kind of censure has a real chilling effect. We have, as I said, the sort of procedural protections that are recognized all throughout the country and historically have been. In addition, we have the Congressional Research Service, cited at page 28 of our red brief, indicating that many lawmakers, before suffering the indignity of a censure, will decide to resign instead. That's a clear indication that lawmakers whose speech are the ones concerned about being chilled by such measures are indeed chilled by such measures, so much so that sometimes they resign. I think I'm still stuck on the distinction you're drawing, so let me give you a contrasting set of examples. In one, the legislature says, you know, we think he's walking around saying these terrible things about the board and we're going to pass a resolution, call it a resolution, that just says he's fomenting distrust of the board and he should be censured for that. Then in the other, they say the exact same thing except they find a rule and they say, you know, in fomenting distrust of the board, he's violating rule ABCD against fomenting distrust of the board. Are you saying that the two should be treated differently? Your Honor, yes, to answer the question directly, and I think historically bodies have recognized the significant difference between those two things. It's the difference that the Fifth Circuit recognized when it said that a resolution of censure goes several steps beyond just accusation and investigation. In your first hypothetical, I would take that as an accusation. What we have in the second example is a determination that, in fact, a rule of conduct has been violated. That is regulatory. It is punitive in a way that the first, which really does, I think, take more the form of an opinion, can't be described of the second example. I would say also that the hypothetical is in important ways a counterfactual because, as I note, before an elective body can adopt the sort of resolution that Your Honor has described in the second half of your hypothetical, virtually all provide the sort of procedural protections which imply a certain gravity to the situation that we think is importantly reflective of the very serious nature of a formal disciplinary censure. I would add, Your Honor, that the line that we're proposing to the Court, which is that when there is an indication of an exercise of formal disciplinary power, the identification and recitation of a rule of conduct, a formal determination that speech has violated that rule, and the imposition of sanctions as a consequence, even when the sanction is only a censure, is a clean and administrable rule. My friends on the other side offer two different versions of the way that you can reverse the Fifth Circuit and both implicate really terrible line-drawing questions. In the first, if a censure is merely speech, and by the way, I'd like to come back to this. This censure plainly is more than speech because it doesn't pose practical penalties on Mr. Wilson. But if a censure is merely speech, Justice Alito, to come back to your question, there is no basis for distinguishing between a censure by a non-elected body versus an elected body. There's also no difference between, Justice Thomas, coming back to your question, the difference between a censure leveled against a private citizen and a censure leveled against a member. It's all just government speech, according to my friends on the other side. And so there would be no reason to think that it wouldn't be free from First Amendment scrutiny and those other circumstances as well. If you buy the federal government's argument instead, and you think that these sorts of disciplinary issues are simply beyond First Amendment reach, you have all kinds of problems with determining, well, I think the court would, I certainly would hope that the court would say that an elected body like HCC's Board of Trustees can't imprison Mr. Wilson. Well, can it fine him $50,000? Well, this isn't exactly imprisonment. I mean, it's a question of the political organization of the United States. There are legislatures, there are committees, there are state governments, and we are a court, which is just part of it. We don't run it. And since we don't run it, the other bodies also have to have some powers, and one of the powers typically is power of administration, power to control the kinds of things others say within the body, what's appropriate, what isn't, and I think that's what the Fifth Circuit was driving at, reimbursing expenses, how you get elected to a committee. I mean, when people are on the committee who's going to be the chairman or who's going to be this or who's going to be that, people can vote for any reason they want who are members of that committee. And the same is true on which expenses you can run, which expenses you can't run. So we get into the business of starting to really oversee this, and we've changed the government structure significantly. I think that lies at the bottom of the argument. Sure, Your Honor, but that's precisely the distinction that I'm drawing. So if you're drawing that distinction, we've had when Senator McCarthy was censured, destroying his political career. That was up to the Congress. And in terms of administrative expenses, every day of the week, the committees over in Congress vote as to what's going to be paid and what isn't going to be paid, who's going to be paid, et cetera. I think that's what the Fifth Circuit had in mind. So if there is a line, why doesn't this pretty clearly fall on the legislative responsible part? Your Honor, those questions about how to constitute committees and who holds leadership positions on the committee are all matters of internal governance to the elected body. They are not decisions about, for instance, who is elected chair of the board are not disciplinary matters. Our theory, I think, draws a very neat and clear line around formal disciplinary measures. It's just formal. So when the committee all votes not to reimburse Senator X, and it does it because he says, well, why did you all vote against me? We do not like you, Senator X. I mean, you know, okay. But if they say, oh, no, it's a formal matter, not okay. And we're judging that? Well, I don't understand most bodies to view things like reimbursements for travel to be discretionary matters. To be sure, Your Honor, I think pocketbook injuries in response to First Amendment expression probably are a violation of the First Amendment. And if I may, I'd like to turn to that element of this case, because just as Thomas was describing, the censure here is a single document. And it includes not only the words he is therefore publicly censured. It includes all of the words that precede that paragraph, which find that he violated rules of conduct. And in turn, it revokes privileges of his office, including his right to receive reimbursements, his right to access community affairs funds, $5,000 worth, a significant amount of money. Mr. Kimberly, if I could just interrupt for a second. As you might guess, one issue is why didn't you cross-petition that? Because as Justice Breyer is pointing out, the Fifth Circuit said that those additional penalties were fine. They weren't the business of the court to get into, and you didn't cross-petition. But I think you lean on them pretty heavily here insofar as it bolsters your argument that the censure is punitive. So why didn't you cross-petition? Your Honor, respectfully, I don't think that's what the Fifth Circuit said about these things. It said instead that they were not a basis for finding a violation of the First Amendment. But it held instead. So we offered before the Fifth Circuit two reasons to find that this censure was a violation of the First Amendment. We said censures generally are punitive, and therefore it is a retaliation. And we pointed to these practical impediments as well. The Fifth Circuit said yes for the first reason, no for the second reason. But the upshot, its judgment, was that we had stated a claim upon which relief could be granted on the ground that the resolution violated the First Amendment. That was all that we had asked for. It's all that we wanted. We're not asking this Court to do anything more by looking to these additional impediments. Nor does it expand the relief that we would be entitled to on remand. As I say, the censure resolution is a single document. If it's unconstitutional, it all goes. It isn't as though some parts fall and others don't. The point is this resolution could not have been adopted consistent with the First Amendment. And under Rule 54C of the Federal Rules of Civil Procedure, we're entitled on remand to any damages that are proven in the evidence. We're not limited to what's just pled in the complaint. So the Fifth Circuit held that the way that this claim was alleged, it had stated a claim upon which relief could be granted. That's great. Now we move on to discovery, and we are entitled to prove up damages however we may. The fact that something doesn't amount to a breach of a violation, that it isn't a basis for liability, doesn't mean that it can't in turn be the basis for an injury on basis of the liability on other facts. And that's the position that we would take. So that's a lot of words, but I really don't understand it. The Fifth Circuit said that these additional measures did not violate the First Amendment. And the question you asked us to review, and that we agreed to review, simply refers to a censure resolution. A generic censure resolution, not a censure resolution that includes in some of its paragraphs things that go beyond merely censuring, but impose tangible punishments or deprivations on the subject of the resolution. Well, so there are two things to say about this, Your Honor. First, in our brief in opposition, we made exactly this point. We said this wasn't a suitable vehicle for the pure censure question, precisely because this censure did include these additional penalties. In their cert reply, my friends on the other side said nothing about the need to cross petition, and in fact described this as an issue going to the merits. And as a counsel for the government noted, this is not a jurisdictional issue. If we reverse on the censure is mere speech premise, that that's all we're deciding, if we reverse on that basis, do you think something's left on remand then? I mean, the Fifth Circuit has already said what it has to say about the other issues, so I mean, I would be happy for a remand to try to rebrief the issue, but it's hard to see the Fifth Circuit taking a different view. I would say our argument on this front, Your Honor, is directly responsive to the question presented. The question presented is, does the First Amendment restrict the authority of an elected body to issue a censure resolution in response to a member's speech? And our answer is yes, when the censure resolution represents an exercise of disciplinary authority, finds rule violations, and imposes sanctions in consequence. If you don't think that that's enough when it's just the censure by itself, then the answer is yes, when the censure in addition, as the censure resolution here did, by automatic operation of the board's bylaws implies additional penalties that limit the censured person's privileges of office. And, you know, on that front, I would point the Court to JA-66, which states that trustees must be in good standing to travel at college expense, and trustees must be in good standing to access community affairs funds. These additional penalties follow automatically in consequence of the adoption of the censure resolution. So there's, coming back again to Justice Thomas's point at the conclusion of the last argument, there's no disaggregating these things. This is all one response to Mr. Wilson's speech. It was to find that he violated rules. It was to accuse him of reprehensible conduct, not just because a majority of the board disagreed with what he had to say, but because they concluded that his speech had violated objective rules of conduct, and in turn he was subject to censure and the revocation of his official privileges of office for a period of one year. Again, on threat, if he did not immediately cease and desist, that the board would continue that impediment for another year by adopting yet further censures. The evidence that we put before the court is that these sorts of resolutions have significant chilling effects. Again, they force individual, they oftentimes will compel individuals to resign. We have also historical through today evidence that authorities view censures as serious punishments. We have then-Congressman Madison's speech on the floor of the Third Congress declaring censures severe punishments. We have contemporary authorities saying the same thing, including the National Conference of State Legislatures describing censures as serious punishments. Which side of your line does Senator McCarthy's censure fall on? Oh, well, I mean, I think it would be, I think it matches the description of the censure in this case. I think what sets that censure apart and what makes it different is that- It matches the description meaning that it's similarly disciplinary. Yes. He was accused of violating certain rules. There was a formality in the disciplinary proceeding, et cetera. Correct. Yes. And the reason that it was not a violation of the First Amendment, however, is because the speech in that case was speech within the legislative sphere. Mr. McCarthy had himself put his speech into the congressional record. It was not put there by those who were censuring him. So it's within the legislative sphere. So everything would have been different if it were a question of Senator McCarthy's public speeches? Public speeches outside of the legislative sphere, yes. I think that's so. And, indeed, the lengthy, months-long proceedings leading up to the adoption of that censure were all focused on his conduct within the legislative sphere, and specifically his conduct at committee hearings, which would fall within that same scope. Within that scope, the free speech right of elected officials is defined by the speech or debate clause, and its corollary, the discipline clause, which make clear that speech within that context may be disciplined. We're not quarreling with that at all, and I think that is responsive to my friend on the other side and his position about history and tradition. We don't dispute that one bit, and the Court needn't say anything about that. That certainly is consistent with tradition to censure legislators for speech within the legislative sphere, but not a single one of the examples cited by the United States is a censure for speech that is protected by the First Amendment outside of the legislative sphere. Well, it seems to me that, and certainly this is the argument that your friends on the other side stressed, I mean, if you prevail, then whenever there is a censure resolution, the response is going to be a lawsuit against the Board for defamation, libel, and that would then go to the courts, and they would have to resolve that. And it seems to me once that remedy becomes widely known and available, it would become automatic, because otherwise it would seem as if you're accepting the factual recitation in the resolution. And so the traditional legislative body debates would all end up in court, and then the court would have to decide a centrally political question that's divided the members of the Board, and that seems an unsatisfactory result. Your Honor, I would have to disagree with the characterization. I don't think anything about ruling in our favor and affirming the Fifth Circuit would open the doors to defamation and libel suits. This Court in Paul v. Davis said that those sorts of suits are generally off the table, that mere offense from defamation generally does not arise to a constitutional level, and we don't disagree with that. I think, again, what separates and really limits our principle here is that it's got to be disciplinary. That is what makes it a regulatory issue, the fact that there is a code of conduct that is not just alleged, but formally found to have been violated. Here, you know, it's perfectly conceivable that HCC could have adopted a censure resolution here that did not punish him for his speech. They could have focused just on non-speech conduct. We wouldn't be here if they had done that. Well, I think maybe we talked about this a little earlier. I just want to clarify your answer. So you think it makes a difference if, during the legislative proceeding, they file a motion to censure a particular individual, and they're going to have a vote on it, and there's a vote on it, and that's the result, as opposed to a code of conduct that says this is what you should do, and there's a vote on whether he violated that particular code of conduct provision? Yeah, Your Honor, the word censure is not a label. The idea of a censure in the sense that we mean it cannot be disaggregated from the power exercised to adopt it and the proceedings that lead, that culminate in its adoption. I'm sorry, what does that mean, can't be disaggregated? Can't be disaggregated means if all that happens is there's a motion to adopt a resolution that uses the word censure, but there's no self-aware invocation of the power to discipline members for rule violations, then that is not the sort, I think, of resolution that would give rise to a First Amendment claim. What ultimately in this context this Court's cases teach is the First Amendment is concerned to avoid chilling speech. And what all of the evidence that we put forward in our red brief shows is that lawmakers, elected officials, understand and appreciate that formal disciplinary measures, not just a resolution by a majority saying I disagree with what this person has said, but charges of rule violations and formal findings of rule violations have a chilling effect. Well, but your position causes a chilling effect the other way. The majority of the Board wants to say something about what they regard as, whatever, reprehensible or offensive conduct. And yet their speech is going to be chilled if you prevail today. I respectfully, Your Honor, I have to disagree. I don't see how that could be the case. All we're saying is they cannot invoke disciplinary authority to exercise the mechanisms in the Board's own bylaws for enforcing a code of conduct on the one hand. We're not saying that they couldn't adopt a resolution that says many of the same things concerning their reaction to Mr. Wilson's speech. They could say exactly as we said in our briefing. Mr. Wilson's speech is in decorous, it is rude, we don't like it, and we disagree with him. So, Mr. Kimbley, does that mean that censure is just not permissible except for things that happen inside the legislative chamber, in the legislative sphere, as you put it, or for conduct that's reprehensible or illegal, that it's just never, censure is just never permitted? Because I think the answer that you're getting at, I mean, it would always be, let's imagine that a member engages in really offensive speech full of racial slurs, that he's said on the floor, let's say, in the debate about some civil rights legislation. The member says all kinds of horrible racial slurs on the floor. That is censurable, and then walks out onto the steps and gives a press conference and repeats those exact same racial slurs. That is not subject to censure ever. That could be subject to a resolution saying what he said is reprehensible, but that could never be censured. That has to be your position, right? That's correct. Yes, Your Honor, but insofar as what HCC is concerned about here is being able to take a position in opposition to the particular issues being raised, they are fully free to do that. There is nothing about affirming the Fifth Circuit on our theory here that would prevent them from adopting a resolution. Indeed, I invite the Court to visit HCC's website. The third item on the news on that website is the adoption of a resolution by HCC's board concerning the importance of diversity in the school and its commitment to seeing that through. That sort of resolution is in the heartland of the sort of statements on matters of public concern that are appropriate for non-disciplinary resolutions. Our point is simply that there is a meaningful distinction between disciplinary resolutions, on the one hand, and those that simply stake out positions. I was just going to say that seems to me a very artificial distinction. So, under your view, the board could say everything it said in the resolution, except at the end say, you know, and we would adopt a resolution of censure, you know, but for that crazy Supreme Court decision in the Houston Community College system which said we can't do that. But, Your Honor, there are significant consequences that follow from the this is what we would do but won't do conclusion there. And, for example, most obviously, Mr. Wilson would not be denied access to board funds or travel reimbursements. Well, that gets to the whole disaggregation question that we've addressed. Right, and as I say, it follows automatically from adoption of a censure. So, really, there is no way to disaggregate these things. The one follows automatically. So, I guess my point is, in addition, there are significant those significant procedural protections are designed to ensure a certain solemnity to the proceedings that it's not just done willy-nilly, that it isn't, you know, it's reflective also of the fact that members of elected boards throughout the country take these proceedings seriously. It just is not something that is done routinely the way that my friends on the other side describe it or otherwise they'd be able to come up with more than 11 examples in 115 years of this sort of thing happening. It just doesn't happen precisely because bodies understand, members of elected bodies understand that it is a serious matter to activate the disciplinary machinery of a formal governmental body and impose sanctions in response to speech protected by the First Amendment. Let me just go further with the questions that Justice Barrett and the Chief Justice raised. Your position makes two distinctions critical, and it's not clear that either can carry the weight that you would put on it. The first is I say something on the floor of the body, and then I step outside and say something on the steps. That's one distinction. And the second is the board, the legislature, says he said terrible things, we hate them, we disapprove of them, we censure them on the one hand, and then says the exact same thing except adds the words anti-violated provision XYZ. It's just not clear that either of those distinctions should matter in the end. Well, I think the question whether they matter has to turn on the question whether one will chill and the other won't. The first question has more, I think, to do with the extent of the constitutional authority of the board, and I'll come back to that in a minute. But the second distinction that you raised, I mean the most that I can point you to, Your Honor, is again the Congressional Research Service suggesting that elected lawmakers resign before facing the ignominy of this kind of proceeding. They don't resign because the majority of the board or the elected body disagree with them, and even when they're willing to express that in a resolution, there is evidence that they do resign and, again, are entitled to all sorts of protections when it's presented as a formal disciplinary matter. In the second example, excuse me, in the first example, I would say that this is, I mean, this is a critical limit on the constitutional discipline authority, both recognized at the federal level, but more importantly in federal common law applicable to state and local elected bodies. They have authority to maintain order within the jurisdiction of their body when they're doing official work and holding meetings. That authority is effectively unlimited within that context, but outside of that context is circumscribed by the First Amendment. I don't think that's a radical idea. I would say overall, Your Honors, the pressing theme here on the other side is that Mr. Wilson is free to continue speaking, notwithstanding the central resolution in this case. But the upshot of the United States and HCC's arguments is that he has to simply accept that he would be subject to discipline for violating the code of conduct in order to continue engaging in the speech that he has. And this is speech on matters of public concern. This is a board with an extremely checkered history. Airing these issues is extraordinarily important, and there is no question we submit, Your Honors, that to reverse would be to chill this sort of speech moving forward. Thank you. Thank you, Counsel. Justice Thompson, Justice Breyer, any further? Justice Alito? I'm not sure I understand exactly where you come down on a number of issues that have been raised. Does everything that you say apply whenever the word censure is used, or does it depend on an allegation and a finding that there was a violation of a rule? It's the second, Your Honor. It depends on exercise of disciplinary authority to find a rule violation and impose sanctions. So if a body issues a censure, a public censure, without alleging that there was a violation of a rule, then there's no First Amendment violation? They're simply speaking? If that censure is not properly considered an exercise of disciplinary authority, yes, Your Honor. I don't think there's a constitutional rule against use of the word censure in response to speech. And the reason for drawing a distinction between those situations is your assertion that a censure issued after an allegation and a finding of a rule violation has a greater chilling effect than anything that can be said, any derogatory statement that can be said about a member without alleging and finding a violation of a rule. Yes, it's a tiger of a different stripe for two reasons. One, we know historically that it has a chilling effect that mere counterspeech does not. But I think it also slots us into what the Court recognized in Laird v. Tatum,  We have a code of conduct here. We have an alleged violation, and it's being applied to speech. That is a violation. But it comes down to the degree of chilling effect. Is that correct? Certainly, that is a principle consideration. And that's an empirical question. And what basis would we have for thinking, put aside the question of how the public would react to the censure of a member of Congress, but what basis would we have for thinking that the citizens within the Houston Community College, whatever the geographical section would be, or the people who are interested in that would draw that kind of distinction? Well, Your Honor, respectfully, I don't think that's the right question so far as chilling is concerned. All right, well, let me phrase it a different way. What reason is there to think that a member of this body would feel more chilled if it was done after a disciplinary proceeding, as opposed to the most horrible condemnation you can imagine done without a disciplinary proceeding? Well, it's the three things that I've said, Your Honor. One, it's the Congressional Research Service cited at page 28 of our red brief, detailing that oftentimes this will compel members to resign rather than deal with the enormity of the process. The second is, again, the adoption of these sorts of protective procedures I don't think is to test, but it is certainly reflective of the importance of the procedure that the lawmakers themselves, who are the ones who adopt these procedures, understand disciplinary proceedings to take on. And finally, it's all of the sources that we've cited that indicate a near universal understanding that censure is highly punitive. It's the National Conference of State Legislatures. It's Demeter's Manual, which is, along with Robert's Rules, one of the best respected parliamentary procedure authorities. And it harkens all the way back to the debate in the Third Congress about adoption of a censure in response to the rescue providers. Thank you. So what do we – I don't quite understand your distinctions. Let's assume they don't say – they just get together and say, we don't like what you did. We don't like you going to community events and lying about the board. We don't like you and what you did. You say that's okay, correct? Correct. But if they say, because we don't like you, we're not going to put you on as a board member, is that okay? As a board officer. Yes, that's okay, because, of course, the body has – it's a matter of internal governance. Is it okay for the board to then say, because you act so inappropriately, assume that you go off and use curse words, we're not going to let you automatically access community affairs funds, but you have to come and get our approval. Is that okay? I think that's a harder case. It's not presented here without the disciplinary element to it. I think that may well be a claim. What's the disciplinary element? He was not permitted to incur travel costs unless he got permission, and he wasn't permitted to access community funds without permission. What's wrong with that? The fact is – and what I'm saying, the distinction is – there isn't this sort of formal process that you want. Yeah, right, right. And so that's, I think, an important and substantive distinction. But I think even on its own, the injury that you've just described may well give rise to a First Amendment retaliation claim because it is a hard and fast pocketbook injury. So how is it hard and fast? What the Fifth Circuit said was he's not entitled to these funds. He always has to seek approval. The fact that they've changed the manner of approval, he still wasn't entitled to them without approval. Well, I guess the point, Your Honor, is that one doesn't need to be entitled to something for it to give rise to a first – you know, like a government contractor is not entitled to win a contract, but if it's denied a contract for reasons protected by the First Amendment, that would still give rise to a First Amendment retaliation claim. Thank you, counsel. Justice Kagan, any further? Justice Gorsuch? Nothing here, thank you. Justice Kavanaugh? Just to be crystal clear, your argument would be the same even if the last paragraph of the resolution were not there? I think the case is easy because it's there. Our argument would be the same if it – well, our argument, we would still be urging the court to affirm, and I think the Fifth Circuit got it right. Thank you. Justice Barrett? Nothing here. Thank you, counsel. Thank you. Rebuttal, Mr. Morris? If I understand my – excuse me – if I understand my friend's on the other side's argument, it's that the board was free to excoriate Mr. Wilson in a general statement, but if it tethered that to a rules violation, then somehow that crossed the line of the First Amendment. But the board offers two interests here. It offers its interest to be able to speak in response to Mr. Wilson, who was no stranger to the hurly-burly of politics and who was publicly using a website to accuse his fellow trustees of crimes and violations of law without supporting evidence. But if you tethered that to a rules violation, then that would violate the First Amendment. The upshot of the position that's being offered to you as a neat and tidy solution of line drawing in this case is that the board can't enforce its own rules through the tool of censure, something that history says this court has allowed – that legislative bodies of all types have done since the founding of the nation. That's a problem. Elected officials these days can be their own independent misinformation machines, and they can do great damage to institutions all on social media. And to say that bodies cannot point to their rules and say, that violates our rules of conduct and we want to punish you for that, that somehow it becomes a First Amendment violation precisely because the government relies upon its rules when asserting its interest is problematic. Mr. Wilson also didn't assert a due process challenge here. He merely complains that he could not have been censured, and censure in and of itself is nothing more than a form of public condemnation. As to what will be the impact if this court were to affirm the Fifth Circuit's ruling, to the Chief Justice's concern, it will spawn lawsuits. And courts will have to engage in reviewing the sausage makings to Justice Thompson's concern about resolutions where things are not disaggregated. If affirmed, this case will go back to the Fifth Circuit, and I presume the Fifth Circuit would have to give a limiting instruction under its ruling, asking a jury to answer the question of whether Mr. Wilson was entitled to mental anguish damages solely on the basis of the words in the censure, but not on the other measures because the Fifth Circuit said those can't give rise to a free speech retaliation claim. There's a Harvard study, a note about this case, and we cited some data as well in our briefing. While it may be unusual in the U.S. Congress to censure, local bodies do it about once every other day in any given year. And they do it for all number of reasons, including for conduct that takes place outside the body. That's a good amount of time. Thank you, counsel. The case is submitted.